No. 27,260.

C. J. R. SMITH, *Appellee,* v. W. A. GILCHRIST, *Appellant.*

SYLLABUS BY THE COURT.

1. BROKERS—*Action for Compensation—Exclusive ·Agency—Evidence.* In an action to recover a real estate commission, the evidence considered and held sufficient to sustain the findings and judgment based thereon.

2. SAME—*Exclusive Agency—Instructions.* Certain instructions relative to exclusive agency considered and held to have been neither improper nor prejudicial.

3. SAME—*Generally.* Various alleged errors considered and held not to require a reversal.

Appeal from Shawnee district court, division No. 2; GEORGE H. WHITCOMB, judge. Opinion filed April 9, 1927. Affirmed.

*John C. Waters,* of Topeka, for the appellant.
*D. H. Branaman,* of Topeka, for the appellee.

Appeal and Error, 4 C. J. p. 908 n. 64. Brokers, 9 C. J. pp. 654 n. 41, 660 n. 67.

Smith v. Gilchrist.

The opinion of the court was delivered by

HOPKINS, J.: The action was one to recover a real estate commission. Plaintiff prevailed, and defendant appeals.

The plaintiff was in the real estate business. Defendant was the owner of certain lots on Quincy street, Topeka. Following negotiations between them in 1923, plaintiff endeavored to sell the lots. Nothing was accomplished that year. There was evidence showing that from July, 1924, and on, plaintiff negotiated with several parties with reference to the lots; that numerous conversations were had between plaintiff and defendant relative to such prospective pruchasers; that plaintiff, among others, interviewed George S. Badders; that in December, 1924, a contract of sale was entered into between the defendant and W. A. Byers (father-in-law of Badders); that on June 15, 1925, defendant and his wife conveyed the lots to Ruby Byers Badders (daughter of Byers and wife of Badders). In addition to the general verdict for plaintiff, the jury answered special questions as follows:

"1. Did the defendant give the plaintiff the exclusive right to sell the Quincy street property? A. Yes.

"2. If you answer question No. 1 in the affirmative, state when said right to sell was given plaintiff, and how long it was to continue? A. During July or August, 1924, for a period of about six months.

. . . . . . . . . . . . . . .

"4. Was the Quincy street property sold to George S. Badders in December, 1924? A. Yes.

"5. If you answer the last question in the affirmative, state whether the plaintiff found and produced George S. Badders as a purchaser of the said property, and whether the said George S. Badders, was ready, able and willing to purchase said property in December, 1924? A. Yes.

"6. If you answer question No. 4 in the affirmative, state whether such sale to George S. Badders was brought about by the efforts of plaintiff. A. Yes.

"7. Did the plaintiff tell the defendant over the phone just previous to making a sale of the property that he had no purchaser for the lots and that if defendant sold them to an outside party, that he, Smith, would not be entitled to a commission? A. No."

The defendant complains of the refusal of the court to set aside the answers to questions Nos. 1, 2, 4 and 7; also of certain instructions. It is argued that there was no evidence upon which to justify or excuse the answers that the sale was made to Badders. The following evidence of the plaintiff is reproduced from appellant's abstract:

"Sometime in the early part of December, 1924, I was talking with Mr. Gilchrist at his place and remarked that I understood that George Badders has to move from where he is located; he is in the automobile business; he was then on Jackson street and he had to leave there; now, he (defendant) says, Mr. Smith, I believe if you will go down there will be something come of it; it sounds good; you go down; I says, surely; I went down and saw Badders; he was out, but I waited and introduced myself to him and told him who I was.

"I told Mr. Badders that if he didn't care to expend the money on the lots, that in my opinion he might get the Dibble Brothers to put up a building, because they had talked to me about that; he says, no, my bookkeeper told me what you said last night and I just came from the Dibble Brothers; he had been over and saw them, and they turned the proposition down; he says the lots are priced right, they are right, the location is fine, now I says, I don't want to bore you, but if they appeal to you I will be glad of it; . . . I talked to him about what the lots would bring in at the time and about what, about the same as I did to the Dibble Brothers, about everything that would be said in a deal of that kind; Mr. Badders says, well, I will think the matter over for a few days and you call me up, and he immediately followed that up, saying, no, I will call you up, and I went back and reported to Gilchrist the conversation; he knew that I had talked to him; I said he seems to be interested in the lots; I think it was in that conversation that I says, Mr. Gilchrist, we have created quite an interest in this block and you are going to find probably in the next few days that there will be agents and other people around here, with all kinds of schemes to talk to you; I said they don't want to deal with an agent, don't want to deal with him, and so on, says I; it is a trick of the trade; he touched me on the arm like that; he says, that's all right, Mr. Smith, no matter who comes they will have to go to you; he not only said that at one time but a number of times, and repeated it next day when we were talking; he made no bones that the exclusive sale of that property—there was no ifs and ands about it; I think it was the same day, while we were talking this came up (about seeing Badders); it was in December; about the next thing that occurred as far as I remember was the 18th of December; I was at home sick, high blood pressure; Mr. Gilchrist called me up; over the telephone; I went to the phone and Mr. Gilchrist says, there is a man here talking to me about the lots; he says he doesn't know you, never talked to any agent, but he wanted to buy the lots; now if you had nothing to do with it I wouldn't owe you any commission, would I? I says, no, if I had nothing to do with it; but I had all to do with it; I had the exclusive agency of it; I knew it; I knew he couldn't go around me; later on I told him that; and he says, I wouldn't owe you any commission then, and I answered him in this voice, in a questioning way, that it seemed to me he would have no trouble in getting my meaning; I says, no, no, you wouldn't owe me anything; he hung up; in about a minute, not to exceed a minute and a half, it occurred to me that Gilchrist wouldn't understand me, he might not catch what I meant; I called him right back within a minute and a half of the time he called; I says, Mr. Gilchrist, about that man you have down

there that you spoke of and that deal, you had better let me come down and close that deal for you; you know that I have the exclusive sale of those lots and you can't sell them without me; he says, they are already sold."

Defendant states in his brief:

"Smith testified that he had been to see Badders and Gilchrist many times and, over the objection of counsel, the court permitted Smith to give a long conversation with Badders, but there was no testimony whatever that the sale was made to Badders or to any one for him. The deeds in escrow at the bank show that more than six months after the execution of the agreement between Gilchrist and Byers, that Gilchrist, at the request of Byers, made a deed to Ruby Badders, the daughter of Mr. Byers. The only other thing that even remotely connected Badders with the transaction was the testimony of Mr. Byers and Mr. Gilchrist that when the memorandum of agreement was first made for the sale of the lots, Mr. Byers borrowed $10 from Badders to bind the bargain. This was not proof at all, and did not possess the dignity of a surmise, that the sale in the first instance was made to Badders. These questions should never have been submitted by the court and we claim there was no testimony in support of such answers and that they should have been set aside."

The evidence was clear that George Badders furnished the $10 to bind the bargain; that he drew the pencil memorandum to bind the sale and had the defendant sign it; that he afterwards personally drew the contract between defendant and Byers in the presence of both of them; that within 60 days after the sale or pretended sale to Byers, he assigned the contract to Badders, authorizing defendant to deed the lots to Badders; that defendant accepted the assignment; that June 15, defendant and his wife executed a deed to Ruby Byers Badders; that at the same time, an escrow agreement was executed providing for deposit of the deed and the contract with the Merchants National Bank to be delivered to Mrs. Badders upon payment of the balance of the purchase price; that August 1 following Badders and wife authorized the bank to cancel the old deed and make a new one from Mrs. Badders to Byers. Byers also testified to the effect that he was receiving only $100 a month rental for the property from Badders for the use of the property because it was in the family. There was additional evidence tending to show defendant gave plaintiff the exclusive sale of the lots which need not be detailed. The defendant's price for the lots was $25,000. The claimed commission was $700. The contract agreement between the defendant and Byers was $24,300. We are of opinion the evidence and the fair and reasonable inferences to be drawn therefrom was sufficient to sustain the findings of the jury.

Complaint is made of certain instructions with reference to exclusive agency. We do not deem it necessary to reproduce such instructions. We are of the opinion that they were justified by the evidence and that no prejudice resulted to defendant therefrom.

Various contentions ably presented by the defendant have been considered, but we find no error which would justify a reversal.

The judgment is affirmed.